OF THE

## STATE OF MISSOURI

AT THE

OCTOBER TERM, 1910.

---

*(Continued from Volume 232)*

---

## MAGGIE CORNELIUS v. BENJAMIN F. CORNELIUS, Appellant.

Division One, February 28, 1911.

1. DEMURRER TO EVIDENCE: What Considered. In ruling on a mandatory instruction for a defendant in the nature of a demurrer to plaintiff's case, it is a precept that defendant's evidence fills no office in so far as it contradicts plaintiff's. Plaintiff's evidence is taken as true, and defendant's contradictory evidence is omitted from consideration. So that an attempt to break down plaintiff's evidence by introducing the stenographer's notes of her testimony at a former trial, showing the omission of material facts vouched for at the present trial, will be given no heed. Plaintiff's credibility is for the jury, not for the court in considering the demurrer.

2. ALIENATION OF HUSBAND'S AFFECTIONS: Demurrer. The evidence in this case is reviewed *in extenso* and is held sufficient to establish (1) a wrongful motive on defendant's part in what he said and did concerning plaintiff, and (2) that what he said and did caused plaintiff's husband to separate from her.

233 Sup.]                    (1)

3. ————: **Wrongful Motive: Malice.** Slanderous words and evil conduct, leveled against a given person, especially when they cover a length of time evidencing a settled policy or purpose, point to a malicious intent. Such malice may be inferred from slanderous and false charges made by a father-in-law against his son's wife.

4. ————: ————: **Lying: Unreasoning Aversion.** Plaintiff, a young mother, living under the same roof with defendant, her husband's father, sued him for alienating her husband's affections and separating him from her. For a long time he refused to answer her innocent inquiries—natural to a normal woman. He had raised up the linoleum in the kitchen and placed a stick under it, to permit it to dry, and when her baby stumbled against it and she took it down, he burst into a flame of anger, told her she had no character and had been too intimate with the next door neighbor, and shook the stick over her head. When the neighbor came for the family milk, and saw her baby about to fall in stepping down on to the porch, while plaintiff was getting the milk, and undertook to prevent the child's falling, he ordered him from the house and told him that he would hurt him if he did not go, and when plaintiff, coming forward, made an exclamation of alarm, he ordered her to stand back and threatened to hit her with the stove lifter which he held in his hand. *Held*, that, allowing that he had been sick and was testy, and there being no reasonable ground for the foul charge, there was ample evidence of malice; and the foul charge being made known to the son, and the son immediately going away and never returning, and there being no other explanation of his going, there was also sufficient evidence that defendant caused the separation.

5. ————: ————: **Threat of Disinheritance.** A threat to disinherit a son, clothed as by a garment with habitual subordination and dependence, though forty years of age, unless he left his wife, made after defendant had brought grave and repeated foul charges against her virtue, would naturally produce the very thing intended, namely, the separation.

6. ————: **Privileged Communications: Slanderous Words.** A suit for wrongfully and maliciously, by wrongful influences and enticements, separating spouses, is not a suit for slander; and the case should not be permitted to ride off on nice questions strictly singular to such suits, such as self-invited slanderous communications being privileged.

7. ————: ————: **Falsehood: Malice.** No one has a qualified privilege to lie or maliciously defame another. Qualified privilege proceeds upon the assumption that the communication was honestly made, in the belief that it was true, and with no motive of malice; and though the occasion be qualifiedly privi-

leged, yet if it is abused, and is used to utter false and slanderous words, the right to prove express malice is open to plaintiff, who then merely carries the burden of proving the accusation was not made in good faith, but was false and made maliciously.

8. ——: ——: **Originating with Defendant: Retraction.** Where the slanderous reports originated with defendant and what he had theretofore said produced the inquiries, the communication made by him is not privileged. So that where defendant had uttered certain false words concerning his daughter-in-law, both to her and to her husband, in the absence of each other, and she, through her husband, invited an interview, to demand a retraction, and defendant thereat repeated the charges, the communications were not privileged.

9. ——: **Instruction: Roving Commission: Omission of Slander.** An instruction telling the jury that "should they believe and find from the evidence that the defendant wrongfully and maliciously induced and influenced plaintiff's husband to leave and abandon her, and to live separate and apart from her, and that plaintiff's said husband, being so wrongfully and maliciously induced and influenced by the defendant, did by reason thereof, leave and abandon plaintiff, and has since lived separate and apart from her, by reason of said wrongful and malicious inducement and influence of defendant, then your verdict will be for the plaintiff," is not a roving commission to the jury, but is approved, and is not erroneous because it omits all reference to the slanderous words which the petition charged defendant had used for the purpose of alienating her husband's affection from her.

10. ——: ——: **Reasonable Grounds of Belief: Slanderous Words.** A reasonable ground for belief is an essential element in good faith and honest purpose. Therefore the court did not err in instructing the jury that defendant not only must have believed the slanderous words he uttered concerning plaintiff, but must have had reasonable grounds for believing them true. In all cases a communication must be based upon reasonable or probable cause.

   *Held*, by WOODSON, J., dissenting, that the law requires parents only honestly and in good faith to advise their children, and it does not require them to have what is ordinarily termed reasonable grounds for their belief that the conduct of the child's spouse has been wrongful. Parents may act upon appearances without investigation.

11. ——: ——: **Presumption of Good Faith.** In a suit by a wife against her father-in-law for alienating her husband's affection, he is entitled to an instruction specifically declaring that he (the parent) is presumed to have acted in good faith,

from an honest impulse, for the best interest of his child, in advising him to separate from his wife, and the refusal of such an instruction is reversible error.

Appeal from Buchanan Circuit Court.—*Hon. C. A. Mosman*, Judge.

REVERSED AND REMANDED.

*Chas. F. Strop* and *James W. Boyd* for appellant.

(1)   The trial court should have sustained the demurrer to the evidence.   There was a total failure on the part of plaintiff to prove that what was done and said was done and said with any wrongful motive or intention, and in this character of action, the suit being against the father, there is and was no presumption in favor of plaintiff, and furthermore there was no proof that what defendant did or said caused the separation, and again whatever was said by defendant came within the rule of privilege and hence was not sufficient upon which to base the present action.   Barton v. Barton, 119 Mo. App. 507; Leavell v. Leavell, 122 Mo. App. 654; Bennett v. Smith, 21 Barb. 439; Rubenstein v. Rubenstein, 69 N. Y. Supp. 1067; Stanley v. Stanley, 68 Pac. (Wash.) 187; Tucker v. Tucker, 32 L. R. A. 623; Young v. Young, 30 Pac. 592; Park v. Park, 91 Pac. 830; Sheriff v. Sheriff, 56 Pac. 960; Oakman v. Belden, 47 Atl. 553.   Also authorities cited under point 2.   (2)   The statements charged to have been made by defendant fell within the rule of what is termed qualified privilege and should have been excluded, but even if admitted in evidence were not sufficient to sustain plaintiff's action, and as plaintiff's whole case is based thereon the court erred in refusing to instruct the jury as requested by defendant relative thereto.   25 Cyc. 393; 18 Am. and Eng. Ency. Law, 1029-1031; Beeler v. Jackson, 64 Md. 589; Billings v. Fairbanks, 136 Mass. 177; Rude v. Nass, 79

Wis. 321; Rosenbaum v. Roche, 101. S. W. (Tex.) 1164; Atwill v. McIntosh, 120 Mass. 180; Livingston v. Bradford, 73 N. W. 137; Buisson v. Huard, 106 La. 768; Erber v. Dunn, 12 Fed. 530; Davis v. State, 22 S. W. 979; Baysett v. Hire, 22 So. 44; Van Horn v. Van Horn, 56 N. J. L. 325. (3)  The trial court erred in giving plaintiff's first instruction. This instruction gave to the jury a roving commission to find for plaintiff. It nowhere stated what facts the jury should find. It did not require the jury to find the facts which were. alleged in the petition as a basis of recovery. The instruction does not in any manner follow the petition. Hamilton v. Railroad, 114 Mo. App. 513; Kohr v. Railroad, 117 Mo. App. 307; Boyd v. Railroad, 108 Mo. App. 306; Allen v. Railroad, 183 Mo. 432.  (4) The court erred in refusing various instructions asked by defendant to the effect that the presumption of law and of fact was that defendant acted from correct motives and on honest purpose, and the court further erred in instructing the jury that defendant must have had reasonable grounds for his belief and action. The court proceeded upon the theory that this cause was to be tried as though the defendant were a stranger or meddler. The defendant's relation to plaintiff entitled him to every presumption of good conduct and the burden was upon plaintiff to establish as a fact the contrary. Barton v. Barton, supra; Leavell v. Leavell, supra; Multer v. Knibbs, 193 Mass. 556; Workman v. Workman, 85 N. E. 997; Pollock v. Pollock, 29 N. Y. Supp. 37; Zimmerman v. Whiteley, 95 N. W. 990; Brown v. Brown, 32 S. E. 321; Reid v. Reid, 33 N. E. 638; Trumbull v. Trumbull, 71 Neb. 186; Eagon v. Eagon, 60 Kas. 705.  (5)  The verdict was excessive and was against the evidence in the case and was the result of bias and prejudice.

*Allen, Gabbert, Mitchell & Martin* for respondent; *Perry S. Rader* of counsel.

(1) The demurrer to the evidence, offered at the close of all the testimony, was properly overruled. There was substantial evidence to support every material allegation of the petition. 1st. There was positive proof that what defendant said and did was said and done with a malicious motive and intention. 2d. There is positive proof that what defendant said and did caused the separation. Nichols v. Nichols, 147 Mo. 387; Hartpence v. Rogers, 143 Mo. 623; Nichols v. Nichols, 134 Mo. 187; Modisett v. McPike, 74 Mo. 636; Strode v. Abbott, 102 Mo. App. 170; Love v. Love, 98 Mo. App. 562; Price v. Price, 91 Iowa 698; Lewis v. Hoffman, 66 N. Y. Supp. 428; Servis v. Servis, 172 N. Y. 438; Klein v. Klein, 101 S. W. 382; Nevins v. Nevins, 68 Kan. 410; Barton v. Barton, 119 Mo. App. 509; White v. White, 140 Wis. 538; Reading v. Gazzam, 200 Pa. St. 105. (a) In determining whether or not the demurrer to the evidence should have been sustained, plaintiff is entitled to have her own evidence taken as true, to have defendant's evidence, where contradictory of hers or of her witnesses, taken as untrue, and is entitled to every reasonable and favorable inference of fact naturally deducible from her own testimony and the uncontradicted testimony of defendant. Forbes v. Dunnavant, 198 Mo. 199; Barth v. Railroad, 142 Mo. 549; Meily v. Railroad, 215 Mo. 584; Gordon v. Park, 219 Mo. 612; Koerner v. Car Co., 209 Mo. 141. (b) "In a legal sense malice implies an act wrongfully and intentionally done, without just cause or excuse. . . . It imports the existence of an intention from which flows any unlawful and injurious act committed without legal justification. . . If I traduce a man, whether I know him or not, or whether I intend to do him an injury or not, the law considers it done of malice, because it is done wrongfully and

intentionally.'' Pennington v. Meeks, 46 Mo. 220; Mc-
Namara v. Transit Co., 182 Mo. 676; Gott v. Pulsifer,
122 Mass. 235; Moore v. Stevenson, 27 Conn. 19; Israel
v. Israel, 109 Mo. App. 374; Nott v. Stoddard, 38 Vt.
32; 18 Am. & Eng. Ency. Law, 998. (c) The charge
made to plaintiff on October 26th and repeated to her
and her husband on the 31st, that she had no character
and had been too intimate with her next door neighbor,
was slanderous *per se*; especially when defendant in
justification of those charges, brought forward the
falsehood, as he says he did, that she had ''frequently''
gone to the barn to meet Marker. R. S. 1909, sec.
4817; State v. Derry, 20 Mo. App. 552; State v. Bonine,
85 Mo. App. 462. (d) Where the words spoken are in
themselves actionable, no proof of malice is necessary;
the law will imply it. Malice will be inferred from
the wrongful act. Carpenter v. Hamilton, 185 Mo.
615; Farley v. Carpenter, 113 Mo. App. 226; Price v.
Whitely, 50 Mo. 323; Hudson v. Garner, 22 Mo. 423.
(e) If the words which defendant testified he used to
plaintiff and her husband on October 31st were the only
words spoken to them, they were still actionable. She
said to him that she understood him to say she had no
character, and he told her (1) that she was too fa-
miliar with Marker, seemed friendly with him, was
holding conversations with him, didn't want the man
in his presence, didn't want him in the yard, didn't
want him about; (2) that he knew Marker the previous
spring had thrown a pebble against the house when
Marker alone was at his home, and in response to it
she had gone to the window and looked out; that she
had abandoned her work of stretching curtains and
walked clear across the yard to talk to Marker, and
leaned on the fence as she did; that her actions had
been indiscreet; that she was not ladylike, that her
conduct was not becoming a lady; that ''she was in-
ducing him;'' and that she had frequently gone to the
barn to meet Marker. These accusations were them-

selves actionable, though possibly not *per se* slander-
ous. Bray v. Callahan, 155 Mo. 43; Noeninger v.
Vogt, 88 Mo. 589; Burch v. Bernard, 107 Minn. 211;
Sullivan v. Com. Co., 152 Mo. 268; Overton v. White,
117 Mo. App. 576; Israel v. Israel, 109 Mo. App. 366;
Moberly v. Preston, 8 Mo. 462; Elfank v. Seiler, 54 Mo.
134; Young v. Fox, 49 N. Y. Supp. 634. (f) Even
if the matter spoken by defendant to plaintiff and her
husband on the morning of October 31st was qualifiedly
privileged, as defendant claims, yet plaintiff proved
malice by showing it was false and that he did not
have probable cause to believe it to be true—for there
is no privilege to intentionally and wrongfully defame.
"Assuming that the evidence for plaintiff showed that
the occasion of the communication was one of qualified
privilege, the case was nevertheless for the jury, for
there was evidence tending to destroy the privilege,
viz., that the published matter was false, and that de-
fendant knew it was false, and did not have probable
cause to believe it to be true." Ashcroft v. Hammond,
132 N. Y. App. Div. 6; Atwill v. Mackintosh, 120 Mass.
183; Israel v. Israel, 109 Mo. App. 373; Reading v. Gaz-
zam, 200 Pa. St. 104; Overton v. White, 117 Mo. App.
576; Yager v. Bruce, 116 Mo. 473; Newell on Libel
and Slander (2 Ed.), 475; Newell on Defamation, p.
392, sec. 10, and p. 391, sec. 7; Laughlin v. Schnitzer,
106 S. W. (Tex.) 908. The evidence was sufficient to
establish malice, even though the communication was
privileged. Mohrman v. Ohse, 17 La. Ann. 64; Weber
v. Butler, 81 Hun (N. Y.) 244. (g) The communica-
tions to plaintiff and her husband on October 31st,
were not qualifiedly privileged, because defendant was
the originator of the charges and what he had pre-
viously said to each of them separately provoked the
inquiry. A demand for a retraction does not make the
communication privileged. Smith v. Mathews, 1 M.
& Rob. 151; Bekair v. Chausse, 15 Quebec Super. Ct.
512; Pattison v. Jones, 8 B. & C. 578, 15 E. C. L. 303;

Nott v. Stoddard, 38 Vt. 31; Griffiths v. Lewis, 7 Q. B. 61, 53 E. C. L. 61; Thorn v. Moser, 1 Den. (N. Y.) 488; Wharton v. Chunn, 115 S. W. (Tex.) 887. (h) The rule of qualified privilege should not be applied strictly in this case. This is not a suit for slander. If it were, then that rule should be applied as it is in slander suits. There could have been a suit for slander founded on the words spoken to plaintiff, but even therein it would have been a question for the jury to decide whether defendant abused the privilege and used the occasion to gratify his ill-will and malice towards plaintiff. But this is a suit for alienation of plaintiff's husband and separating him from her—not a suit for injury to her reputation and good name, but for depriving her of the support, companionship and confidence of her husband. The words spoken are introduced as matters of evidence, as an inducing cause. They are not the very basis of the action, as in an action for slander. The rule as to their being privileged should not be applied to them with the same strictness as in such suits. (i). The words were spoken in malice. Multer v. Knibbs, 193 Mass. 559. (2) Whether the statements made by defendant to plaintiff and her husband on the morning of October 31st fell within the rule of what is termed qualified privilege or not, they should not have been excluded, if there was evidence that defendant abused the privilege, and took advantage of the occasion to gratify his malice toward the plaintiff. "The occasion was not one where the defendant was absolutely privileged, like a witness testifying in court, and some other cases where from principles of policy the occasion is absolutely privileged, irrespective of the motive or malice." Though the occasion was privileged, the words were not, if they were spoken with malice. The question of malice ought to have been submitted to the jury. "If defendant knew the words to be false, and had no occasion to believe they were true, it should be sufficient

and conclusive evidence of malice." Nott v. Stoddard, 38 Vt. 31; Ashcroft v. Hammond, 132 N. Y. App. Div. 6; Multer v. Knibbs, 193 Mass. 559; Atwill v. Mackintosh, 120 Mass. 183; Laughlin v. Schnitzer, 106 S. W. (Tex.) 909; Buisson v. Huard, 106 La. Ann. 776; Rude v. Noss, 79 Wis. 327; Railsback v. Railsback, 12 Ind. App. 663. In instruction 15 as asked by defendant, he assumed that, although his statements were made "at the request and demand of plaintiff," he was liable if the "said statements were made by the defendant willfully and maliciously" and "with the intent to cause plaintiff's husband to separate from her," and "did actually cause such separation." The words in quotations were in the instruction as asked, and were retained in the form in which it was given. Defendant cannot assume in this court an attitude contrary to the one he invoked at the trial. Wolf v. Supreme Lodge, 160 Mo. 685. (3) Plaintiff's first instruction was correct. When it and her instruction 6 are read together it will be seen that they are in every material respect a rescript of instruction 3 in Nichols v. Nichols, 147 Mo. 392, and instruction 6 in Hartpence v. Rogers, 143 Mo. 635. It should also be stated that the petition in this case is modeled after the petition in Nichols v. Nichols, 134 Mo. 191, which on demurrer thereto and appeal was held to be good; and on the second appeal in the same case and from a trial and judgment on the same petition, this court said that "the instructions given for the plaintiff submitted the main issue in unobjectionable terms, and upon the measure of damages was as definite as the nature of the case would permit," and that "we find no error in the instructions given by the court for the plaintiff." 147 Mo. 392. So therein is found a complete answer to appellant's contention that the first "instruction does not in any manner follow the petition." An instruction not so full and not so explicit as the plaintiff's instruction one, but involving the same legal principles, was ap-

proved in Klein v. Klein, 101 S. W. (Ky.) 384.  (4.)
The court gave various instructions to the effect that
the presumption of law and of fact was that defend-
ant acted from correct motives and an honest purpose.
(a) In instructions 13, 17 and 18, given for defendant,
the court specifically told the jury that plaintiff could
not recover if the statements made by defendant to her
and to her husband were made ''from a pure motive;''
and in instruction 18, the court told the jury that the
defendant had a ''lawful right'' to advise his son in
any matter pertaining to his son's welfare, and that
this right ''extended to the domestic affairs of the
son;'' and that it was defendant's right and ''duty''
to communicate to his son ''such information as he pos-
sessed and believed, and had reasonable ground to be-
lieve, touching the conduct of plaintiff, which he
deemed it to the interest of his said son to know,'' and
that if the statements made to his son, as to the con-
duct of plaintiff, whether they were true or false, were
''believed by defendant, and he had good ground to be-
lieve the same to be true, and he communicated the
same to his said son with a proper motive and intent,
and with a desire to promote the welfare of his said
son, and not from malice, then you will find for defend-
ant; and you are further instructed that it devolves
upon the plaintiff to establish by evidence to your sat-
isfaction that the defendant was actuated by malice in
what he did or said in the premises.''   Here are clear
declarations to the jury that ''the law presumes that
defendant acted from correct motives and an honest
purpose.''   Because those exact words were not used,
the instructions are not faulty; words of equivalent
meaning were used, and that is sufficient.   No one can
read instructions 2, 13, 15, 17 and 18, especially 18, and
fairly conclude that the instructions do not in effect
tell the jury that the law presumes that defendant acted
from correct and proper motives.   Burdict v. Rail-
road, 123 Mo. 236; State to use v. Wissmark, 36 Mo.

592; Meiners v. St. Louis, 130 Mo. 286; Lynch v. Railroad, 112 Mo. 433; Naylor v. Cox, 114 Mo. 244; State v. Atchley, 186 Mo. 195; Tyler v. Hall, 106 Mo. 323; State v. Hicks, 178 Mo. 444; State v. Thornhill, 177 Mo. 695. The case of Barton v. Barton, 119 Mo. App. 507, does not in the least condemn the instructions given in this case. The instructions in that case were condemned because they did not require the jury to find that the defendants "acted maliciously" in inducing the separation, and because the case was an exceedingly close one on the facts. Nor does the case of Leavell v. Leavell, 122 Mo. App. 654. In fact, not one of the cases cited by appellant decides that the trial court must say in so many words that "the law presumes that defendant acted from correct motives and an honest purpose." If those ideas are fairly presented to the jury in the words used, as they were by the instructions given in this case, that is sufficient. On the contrary, in Klein v. Klein, 101 S. W. 384, the court held that an instruction declaring "the presumption of law in this case is that a parent is presumed to have acted for the best interest of the child and for the honor of the family" was "properly refused, as it would have been misleading under the proof." (b) Besides, the word "presume," or the words the "presumption of law is," are always objectionable in an instruction. State to use v. Estel, 6 Mo. App. 6; Mach. Co. v. Pierce, 5 Mo. App. 575. (c) The court did not err "in instructing the jury that defendant must have had reasonable grounds for his actions." If it was error to assume that defendant must have had "reasonable grounds for his actions," then defendant invited the court to commit that error, for twice in instruction 18 as asked by him the words "had reasonable grounds to believe" and "had reasonable grounds to believe the truth thereof" are used; and that part of that instruction the court gave without any modification whatever. Smart v. Kansas City, 208 Mo. 204; Tetherow v. Rail-

road, 98 Mo. 85; Clippard v. Transit Co., 202 Mo. 446; Christian v. Ins. Co., 143 Mo. 460. But it was not error to instruct the jury that defendant must have had reasonable ground for his action. Defendant did not in the trial court plead that he was a lunatic and therefore not accountable for his action; he ought not to be permitted to take that position here. Every sane man must have a reasonable ground for his torts, or respond in damages. Oakman v. Belden, 94 Me. 280; Ashcroft v. Hammond, 132 N. Y. App. Div. 6; Atwill v. Mackintosh, 120 Mass. 183. The court did not proceed "upon the theory that this cause was to be tried as though defendant were a stranger or meddler." That charge implies a clear misconception of the instructions given by the court for defendant, as well as of those asked by him. Instruction 18 clearly establishes that misconception, as do other instructions (2, 15 and 17) asked by defendant. (5) The verdict was not excessive. Williams v. Williams, 20 Colo. 68—where the court held that a verdict of $12,500, was "scarcely more than compensatory." Lockwood v. Lockwood, 67 Minn. 480, where no effort was made to show the amount of defendants' wealth, and their conduct "appears to have been wilful and malicious," and a verdict for $15,000 was permitted to stand. Reading v. Gazzam, 200 Pa. St. 104—where the court allowed a verdict for $25,000 for a wife, apparently over fifty years of age, against another woman, to stand. Speck v. Gray, 45 Pac. 143—where a verdict for $15,000 for a husband for loss of his young wife, was permitted to stand, without any showing of defendant's wealth. Fuller v. Robinson, 230 Mo. 52—$10,000. In every one of these cases the contention was that the verdict was the result of passion and prejudice on the part of the jury. The amount of damages was purely a question for the jury. Nichols v. Nichols, 147 Mo. 407; Hartpence v. Rogers, 143 Mo. 638; Minter v. Bradstreet, 174 Mo. 504; Williams v. Williams, 20 Colo. 68.

LAMM, J.—Sued for alienating the affections of her husband and separating him from her, defendant appeals from a judgment of $15,000 in favor of Maggie Cornelius.

There were two trials and two verdicts—the first (for the same amount) was set aside.

In so far forth as the material averments of the petition are drawn in question, such question arises on the scope of plaintiff's first instruction; therefore, those averments and the instruction will presently be considered together. Emmett Cornelius is the husband of plaintiff and the only child of defendant. Defendant's answer admits such relationship and "denies each and every other allegation of plaintiff's petition." Maggie Cornelius, nee Bigham, married to Emmett in 1902, was, say, 27 years and he 38. While not close neighbors, yet they were neighbors, when living on farms in the region of St. Joseph. They were old acquaintances, their families of the same religious faith and members of the same church. At the time of the marriage, defendant was a widower, aged sixty-eight years. He had moved from his farm to the city of St. Joseph, where he owned property and had an interest in a business—among other pieces of property, he owned a dwelling on Mulberry street. The record shows inferentially that he was in comfortable circumstances, but the extent of his estate is dark. Plaintiff, her husband and defendant lived in the Mulberry street dwelling as a home. A baby was born to her—aged two years at the time of the separation. The family establishment was modest. Plaintiff kept house, doing the housework. The testimony bears the construction that Emmett provided for the table, defendant for repairs, taxes, gas and water rates and that he and his son had a common purse. Sometimes Emmett was employed, earning an income at one place and another; sometimes he was employed by his father to look after his affairs and property. Enough appears to show

that while the son had some money of his own earning and was his own man, yet he depended on his father to an extent, abode with him, and the relations of the two were those natural to an affectionate father and only son where the son chooses to remain subordinate after reaching man's estate. In October, 1905, Emmett separated from his wife and child. He and his father left her and the house on Mulberry, the father presently giving her the key and ordering her to take her belongings away and return the key. This she did shortly. Since then she has lived by her needle, and her husband, having put her away, lived apart from her.

Defendant challenged the sufficiency of the evidence to make a case against him. To that end, at the close of the whole case, he asked a mandatory instruction which was refused. He saved the point and assigns it for error. When that assignment is reached presently, its determination seeks other material facts then to appear.

In effect the errors assigned are:

*First.* There is no substantial evidence to support the verdict (and herein of the mandatory instruction).

*Second.* Incompetent and illegal testimony was admitted for plaintiff.

*Third.* The court gave improper instructions for plaintiff, refused proper instructions for defendant and made improper modifications of defendant's instructions (and herein of instruction 18, said to be given by the court *sua sponte*).

*Fourth.* The verdict was excessive and the clear product of bias and prejudice.

Of these, *seriatim*:

I. *Of the mandatory instruction.*

Whether there was error in its refusal turns on other facts presently stated. In ruling on a manda-

tory instruction for a defendant in the nature of a demurrer, it is a precept that defendant's evidence fills no office in so far as it contradicts plaintiff's. Contradictions are for the jury. On a demurrer, plaintiff's evidence is taken as true. Hence, we may omit defendant's contradictory testimony. Defendant sought to break down plaintiff's credit as a witness by evidence tending to show she had made contradictory statements at a former trial and that the stenographer's notes at that trial showed she had omitted material facts she vouched for at the last. But we need take no heed of that kind of proof. It went to her credibility, to the weight and quality of her testimony, i. e., was for the jury, not us. Certain material testimony on plaintiff's behalf was objected to as privileged communications. It was admitted and counsel saved the point. Because of a conclusion reached, to be announced further on, we shall take that testimony as competent in ruling on the present assignment of error. Assuming facts stated at the outset and plaintiff's evidence as true, and proceeding to deal with the case made by plaintiff as strengthened by admissions of defendant or by testimony of defendant of that tendency, in substance, the further facts are these:

Plaintiff and her husband lived in apparent marital felicity from their marriage down to the summer and fall of 1905—there was not a "ripple," to use a record word. For aught that appears, he did his duty as a husband she hers as a wife with full fidelity. Up to the separation, the record is barren of a vestige of testimony tending to show that her husband at any time took the initiative in formulating charges against her or had any grievance against her of his own making, or she against him of hers. The unhappiness that came to the two was (as far as disclosed) because the husband at the end took color, edge and action from the charges of his father, the defendant, against her. Hard by the Mulberry dwelling lived one Marker—a

married man with a young family, an acquaintance of
defendant and Emmett Cornelius of long standing. So
far as this record shows, Marker was a man respec-
table in character, habit and pursuit. Plaintiff knew
him and his family only after she was married and
moved to Mulberry street. The Cornelius family had
a milch cow—the Markers none. For months prior
and after the event we are about to relate, the Markers
got milk of a morning from plaintiff. One morning
Marker came to the kitchen door for milk. If he ever
came before it was but once or twice, and he certainly
never came again. At that time defendant, not feel-
ing well, was in his room, opening into the kitchen
through a door. Plaintiff's baby, then learning to
walk, appeared at this door and was about to fall down
the step into the kitchen. Marker asked for his milk.
Plaintiff went out on the porch to get it. There was a
grocer there to take plaintiff's order for groceries, and
Marker utilized the time to give his own order—both
families being customers of the grocer. At about that
time Marker noticed the danger to the child and went
to it. Defendant then saw him and, stopping to make
no inquiry, resented his presence. He got up, seized
a stove-lift or poker, ordered Marker from the house by
a threat to "hurt him and hurt him bad" if he did not
go. Plaintiff, hearing this explosive and angry threat,
came in from the porch, got (or was going) between
the two men and made an exclamation. Thereat de-
fendant turned on her and said: "Stand back or I will
hit you." This was in the spring. During that spring
defendant had a sick spell. He was not over it at the
time and there is testimony that during this indispo-
sition he formed a dislike for her and thenceforth she
could not please him. If she would "ask him anything,
he would not tell her." Things ran on till October
of that year. It seems the kitchen floor was covered
with linoleum. About the sink it was damp and rats

bothered.   Defendant put a patch of tin over a rat hole and lifted the linoleum, putting a broomstick or other stick of wood under it to hold it up to dry the floor— all this in the absence of plaintiff.   Plaintiff, pres- ently, with her baby, came into the kitchen to cook a meal.   The child stumbled over the rise in the linoleum and bumped its head on the stove.   Thereat the anx- ious mother took out the stick to smooth the floor and put it in a corner.   Soon defendant came in and made discovery that the stick was gone and the linoleum flat on the wet place.   He asked plaintiff: "Who took the stick out from under the linoleum?"   She said, "I did," and went on to say she would put it back after dinner.   He retorted: "No you won't," and picked it up and shook it over her head and told her she "had no character;" that she had been "too intimate with the next-door neighbor."   Plaintiff admonished him to be careful what he said about her character, that he might have to prove it.   To that defendant replied he would "talk to my father," he would "talk it in court," he would "live by it and die by it" and "was going to stick to it."   Emmett Cornelius was present at neither the linoleum nor the milk incident.   When on the stand, defendant's version of the linoleum affair did not dif- fer materially from plaintiff's.   Referring to Marker, he admitted he said to his daughter-in-law at that time that (to use his own words on the stand) "her actions had been indiscreet, or something like that; that she was *inducing* him, it seemed to me; that she kept— would talk to him more than I thought was right, and more than I felt was discreet; I wanted that man away from the house; didn't want him in the house; I felt that way."   Going back a little—in August, 1905, it seems (according to defendant's testimony) Emmett asked defendant, "What the trouble was between him and Mr. Marker?" and defendant had replied that "Marker was making himself too familiar about the house;" that "things didn't look right to me."   In

that conversation, we gather the father used the term that her conduct "was not becoming a lady." Plaintiff was not present then. Recurring to the linoleum incident, four or five days afterwards there was a conversation between plaintiff, defendant and her husband. With that conversation came the crisis. The court ruled that plaintiff could not tell any conversations with her husband (at that or any other time), whether alone or in the presence of third parties, explanatory of or giving grounds for his conduct, but enough appears to show that plaintiff sent her husband to defendant, who was in the yard, to ask him to come into the house and "retract" what he had said. Defendant came in response to that message. Defendant objected to the conversation because invited by plaintiff and privileged. To that phase of it we will recur later. As told in the record, the conversation was broken by interruptions and is evidently scantily reported. When asked what proof he had for what he had said against her, defendant gave a "pebble" incident, viz.: It seems a pebble was thrown against the Cornelius house in the daytime. There is nothing to show that Marker was at home or, if at home, had thrown the pebble as a signal or at all. Plaintiff and defendant were together in the house and one went one way and the other the other to see who threw the pebble and neither saw any one. Defendant said he knew Marker threw the pebble "because Mr. Marker waited until he knew nobody was at home." (*Nota bene*: Subsequently during the trial, proof went in that Marker had not thrown a pebble and tending to show that his family was at home.) Demanding further proof at his hands, defendant related a curtain-stretching incident in which he claimed that while out stretching curtains plaintiff talked with Marker "over the back fence." Plaintiff denied she had done so. (Note: Subsequently at the trial, it was clearly shown that at the time of that incident several women and men

were present, among them a lady who lived on the other side of the house, Mrs. Marker and a cousin of Marker and the latter's wife. In that affair there was a general conversation among all the parties, all of them acquaintances and all of them respectable on this record. Plaintiff denied she had talked to Marker otherwise than in the general conversation—and others taking part testified the same way.) Demanding further proof, defendant said that plaintiff did not go to the barn unless Marker went and that once plaintiff went out and got something in her apron and when he asked her what it was, she didn't tell him. Plaintiff denied all knowledge of the latter incident. Referring to meeting in the barn, it seems there are two barns—one on Marker's and one on Cornelius's side of the lot fence, independent and disconnected. On cross-examination, defendant testified that she had "frequently" gone to the barn and Marker would come from the barn at the same time. Pressed on the point, defendant instanced two or three times in the course of his observations when Marker went to his barn, plaintiff went to hers. Whether this covered the three years on Mulberry, the record does not show. At any rate, plaintiff denied such visits. This retraction conversation was going on for ten or fifteen minutes. While plaintiff was not permitted to tell any conversation she had with her husband leading up to or during this "retraction" talk, yet it was elicited by her cross-examination that her husband had said he did not believe those charges. The fact is, however, he left the house at once at the close of that conversation and then and there abandoned plaintiff once for all. After he left, defendant left as soon as he could get his overcoat and hat. On being asked where he was going and where Emmett had gone, he did not answer. Presently, at about eleven o'clock of that day, defendant returned. Plaintiff was preparing the family dinner and when ready asked him out to eat. Thereat he re-

plied: "Maggie, you needn't cook for me any more; I have got someone else to cook for me." Then plaintiff: "Father, if you want us to leave just say so and we will go away." Then defendant: "As for you, you can go, the sooner the better, but as for Emmett, he will not go, he will stay with me." Then plaintiff: "You can lie about me, you can take everything else, but there is one thing you cannot take, you can't take my husband away from me." Then defendant: "*I will take him from you. If he don't leave I will disinherit him, I have told him I will do it, and I will.*" Plaintiff was left to eat her dinner alone, and about one o'clock defendant left the house. The next morning he returned and was asked by her where Emmett was. First he did not tell, "but after a great while" he told her that he stayed all night at the Galt House, and if she wanted to see him perhaps she could find him there. Her own father took her to the Galt House. On the street there they had a conversation with Emmett. Defendant passed out of the Galt House and went away when the conversation opened. Her counsel offered to show the reasons there given by her husband for leaving her and not going back, but, on objection of defendant's, the offer was refused. The following day, her husband sent word for her to meet him at his attorney's office. She went there with her father. There was a conversation at that time and place, but it was excluded. That was the last talk she ever had with him. Presently, she brought this suit. After suit and before service, defendant left St. Joseph and went to Kansas City. We infer the court got jurisdiction by attachment and constructive service. During his stay in Kansas City in the first few days of November, 1905, defendant appeared at the home of Rev. Mr. Allen, a former pastor of his, and stayed all night. That was on Monday. He told Mr. Allen that he came to Kansas City on the prior Saturday. Mr. Allen asked him about Emmett and his wife—he having mar-

ried them. Defendant replied that "they had parted;" that there was "some person . . . who kept coming there" and he had "tried to get her to keep him from coming and she would not do it;" that he was going to Florida and was going to take Emmett with him. In that conversation he admitted he was in Kansas City "to be out of trouble," or "to be out of the way." Defendant also told Mr. Allen that he had told plaintiff to get what she wanted out of the house and that "Maggie blamed him," defendant, for "all the trouble;" that Emmett was going to straighten up the business, would be down in a week; that he was looking for him next Saturday, he was coming to Kansas City and they would then go to Florida. The twain went together to Florida at the father's expense, spent the winter and then went to California. The son returned to St. Joseph after the extended absence, but defendant came to Colorado, stopped there, and appeared at St. Joseph for the first time at the trial. His sickness in the early part of 1905 continued until the summer, and it is fair to conclude from the testimony that during that summer he contemplated going to Florida when "cold weather set in" on account of his health and on advice of his physician. While he never told plaintiff he intended to take her and Emmett along, yet in the late summer she learned of that through her husband. The evidence indicates that plan was abandoned, if it ever existed, before the separation.

Such are the facts on which the demurrer must stand or fall.

As indicated, we thought to set forth the charging part of the petition in connection with the first instruction. But it is pertinent here and may as well appear now. The petition, *inter alia,* charges that while plaintiff and her husband were living happily together, enjoying the aid, society and affection of each other, defendant maliciously made slanderous remarks and statements against plaintiff's character

with the malicious intent to cause her husband to leave and abandon her and to deprive her of his support, society and protection; that in pursuance of such wicked, wrongful and malicious intent, he did wrongfully, wickedly and maliciously (quoting) "induce and influence plaintiff's said husband to leave and abandon her. And her said husband, being influenced by and acting under the said wrongful, wicked and malicious enticements, and false and slanderous charges of defendant, did then and there leave and abandon her, and being influenced by and acting under said wrongful, wicked and malicious enticement, influence and inducement, has ever since remained away from and separate and apart from her, and ever since said abandonment the defendant has wrongfully, wickedly and maliciously detained and harbored and held out hope of reward to plaintiff's said husband, for the purpose and with the intent of keeping her said husband separate and apart from her, and has so kept him separate and apart from her, and has, by his said wrongful, wicked and malicious acts and conduct, deprived plaintiff and still deprives her of the aid, support, companionship, society, protection and affection of her said husband."

It is argued there is no proof of wrongful motive in what defendant said or did; and none that what he said or did caused the separation. But learned counsel inadvertently argue unsoundly in that behalf. This, because the record abounds with signs of defendant's rooted antipathy for his son's wife. Wrongful motives like good ones are impalpable—a condition of the mind. They are not to be seen by the eye of the body, but by the mind's eye. They are not felt by the fingers of the hand, but must be felt for by the minds of the jury. They may be proved only by those visible acts or words shadowing forth their existence in the mind—words and acts standing as outward manifestation of inward feelings. No matter how

stoutly defendant protested (as here) that his motives were innocent, he may not be allowed to sit as final arbiter in his own case in that behalf. [Knorpp v. Wagner, 195 Mo. l. c. 665.] Out of the fulness of the heart, the mouth speaketh, and evil words and evil conduct, leveled against a given person, point to an evil, a malicious, intent. Especially so when those evil words and that evil conduct cover a length of time evidencing a settled policy and purpose. Granted that a father is presumed to be actuated by fatherly and honest motives, yet a father under the spur and pressure of parental instincts and the course of nature has no more leave to lie about his daughter-in-law by making false and slanderous charges against her than has anyone else. Much may be conceded and forgiven a father's solicitude, but that does not excuse lying and slandering. We know of no rule of law or ethics among civilized mankind enlarging the offices of a father by the addition of any such abominable prerogative.

Was there evidence of ill-will and wrongful motive? This record reeks with it—if plaintiff told the truth. Look at it! Here is the father-in-law of a young woman, a mother, living under the same roof and eating salt at the same table. For a long time he refused to answer her innocent inquiries—inquiries natural to a normal woman and always tolerated by those quickened by the amenities of life. Such course showed deep and drawn-out aversion. He burst into a flame of anger when she took a broomstick from the floor of her kitchen under circumstances balancing the welfare of her little child against the welfare of a wet kitchen floor. Did that show the tenderness or goodwill due from a father to a daughter-in-law? Nay. Conceding he was sick and testy, do the sick who love people treat them in that fashion? He threatened and was about to assault a neighbor who appeared in his daughter's kitchen for his morning milk and was engaged in a kindly act towards her child. Did that

show fatherly regard for her womanly feelings, let alone her customer's? With a lethal weapon in hand he menaced and threatened her with bodily harm on her appearance on the scene—a scene well calculated to startle and alarm her. No one does that who has love or other gentle emotions in his heart. In the broomstick affair he made a dark and deadly accusation against her chastity. There was ample proof before the jury to lead them to conclude there was no reasonable ground whatever for that foul charge. The jury need not look elsewhere for proof of malice more clear or impelling. He went further—he laid such stress on that accusation as to assert he would tell her father, tell it in court, stick to it and live and die by it, thus removing it from the realm of a transitory ebullition of wrath. If it was false (and the jury evidently believed it so) they had proof of a settled malignant purpose— a purpose and object only to bear its intended fruit when the accusation was made known to the son. It was made known to him. He was told by defendant that his wife's conduct was not becoming a lady and that Marker's familiarity about the house didn't look right. Defendant denied he told his son aught else, but the jury could believe or disbelieve him on that score. He admits telling enough, if slanderous, to naturally poison the mind of his son. The jury could have well concluded that with this list of charges conned over, and nursed, he told him all of them, the whole category from A to izzard. It, then, became necessary, in the very fitness and immutable nature of things, that the cloud gathering over that household should be speedily scattered or the home would be desolate; for the situation was intolerable to a wife and mother. Accordingly, he was called upon to retract his accusations. Did he retract? He had a *locus poenitentiae*. Did he use it? There is no pretense of that—*contra*, he stood by his charges. Not only so, but he listed new ones of the same ilk—every

one a poisoned arrow aimed at plaintiff's breast, provided the jury believed her story. Witness: The pebble incident. The curtain-stretching incident. The going-to-the-barn incident. The having-something-in-her-apron-which-she-would-not-show-him incident. On the heels of that recital, he told plaintiff he had another cook and she was not to cook for him any more. The very instincts of his daughter-in-law told her that meant a separation between her father-in-law and her. When she replied that she and her husband would go away if he just said so and if he wanted them to leave, he declared his purpose to cause a separation between the husband and wife. In effect, he said to her, go; that she need not stand on the order of her going, but go at once—"the sooner the better;" but the husband would not go. He would stay with his father. He would take him away from his wife, he would disinherit him if he didn't leave her. To leave no doubt in her own mind (or that of any believer in her story) of his power (and disposition to use it), he told her that he had told him he would disinherit him and assured her he meant it. That defendant denied making such admissions is nothing to the purpose. The jury put their own estimate on that denial and found that plaintiff told the truth. The case, then, may proceed here on the assumption of ill-will, of malice, of slander, of threats to disinherit communicated to a son habituated to depend on his father's advice and purse—one verily borrowing light and heat from him as surely as the earth does from the sun.

One of the remaining questions is: Is there any substantial evidence from which the jury could rationally infer that these acts, false charges and bad motives caused the separation? There are two ways of reasoning—both allowable—one from cause to effect; the other from effect back to cause. Human nature is such that however closely knit the ties that bind a husband to a wife, they are liable and likely to be

weakened by facts such as are passing under review. Here were two young people, living in amity and love as husband and wife. No cause whatever is shown or attempted to be shown for the alienation of the husband's affections or their separation, except that the husband's mind was fatally twisted and poisoned against her virtue. Under this record that poison was administered only by a father's hand and was the more deadly because from his hand. The broad and controlling fact is that at once he put his wife out of his life and thenceforward did no kindly act or said no kindly word for her solace, comfort, protection or support. What caused that ruin? Was the jury left to mere guess or conjecture? Evidently not. The cause shown and effect shown fit like a hand to a glove. This view is much fortified by the rather peculiar relations existing between defendant and his son. Here was the son nearly 40 years of age. In addition to the trust and confidence due from a child to a father, this one was clothed as by a garment with habitual subordination and dependence. In that view of it, he was the more likely to be wax in his father's mailed hand. A threat of disinheritance to such a son would naturally produce the very thing intended to result, viz., separation. How great, how imminent and how about to fall was the danger of it when the son's affection for his wife had been attacked and doubtless undermined by his father's accusations against her? May a father who presents the sore alternative of separation or disinheritance to a dependent son be heard to say his choice of separation is not a natural result of the choice presented? Hardly.

Was there matter of substance from which the jury could conclude that plaintiff and her husband were kept apart by the wrongful conduct of defendant? We think there was. The permanent separation is but a natural sequence of the steps preceding it, viz., slanderous and malicious intermeddling that, first,

sapped and weakened his marital affection; that, next, broke it quite down; that, next, produced the separation—a separation naturally hardening into a state of permanency without other cause. The jury could well infer that this continuous situation was well laid at defendant's door. The cloud that gathered and broke on her head, raining down hail like iron, was *his* cloud. Moreover, not only was defendant the author of the original wrongful acts which by direct chain of causation led up to the permanent result, but there is proof that he harbored, aided and abetted his son into making the separation final. (See the squib case, Scott v. Shepherd, 2 Blackstone Rep. 892.]

We conclude the verdict was supported by cogent proof of all the material allegations of the petition and covered the whole scope of them. The law, then, should not put the shield of a mandatory instruction between him and twelve men in the box.

There was no error in ruling the demurrer.

II.  *Of Improper testimony.*

The "retraction" conversation is the bone of contention. Counsel argue it was privileged. They do not make privilege a separate point, but weave the idea into their discussion of certain instructions. We shall take it by itself, though it belongs both there and here. Their theory is that privilege arose because defendant talked on plaintiff's own suggestion and invitation. They contend that what defendant then said was in answer to inquiries; hence, the privilege. In effect their position amounts to this: If damages resulted it was self-invited—*volenti non fit injuria.*

We think the point without substance, because:

(a). This is not a suit for slander and the case should not ride off on nice questions strictly singular to such suits. To let in such questions as controlling is to obscure the real issues. Here the specific slander is not set forth in the petition and there was no plea

of privilege as a defense.   This is a suit for wrongfully and maliciously, by wrongful influences and enticements, separating spouses.   Barring variations immaterial to principles of law applicable to this kind of a case, the petition, *mutatis mutandis*, is a replica of that in Nichols v. Nichols, 134 Mo. 187.   That petition was held bad, *nisi*, on demurrer.   This court held the petition good and sent the case down for trial on its merits.   It was argued in that case that if acts done and words spoken were not set forth in the petition it thereby became in effect but a mere conclusion of law, and, hence, vicious.   An excerpt disposing of that contention is apposite, viz.:   "The ultimate fact which is constitutive of the cause of action in this case is that of wrongfully inducing the husband of plaintiff to abandon her. *The methods adopted to accomplish that purpose are mere matters of evidence from which the ultimate fact is proved or may be inferred.*   Various methods may have been adopted to accomplish the purpose and a denial of them, if stated, would not form a single issue involving the whole remedial right.   They would be probative, and not constitutive, facts.   In the opinion of the jury an inference that defendants wrongfully induced plaintiff's husband to leave her might not be drawn from one or more acts proved, but might readily be drawn from them all taken in the aggregate. *No issue could, therefore, be made upon each act and statement of defendants that would conclude the right of plaintiff to recover.*

"Wrongfully inducing plaintiff's husband to abandon her is a conclusion of fact depending upon the proof of acts, declarations, and conduct of defendants.   It is not a conclusion of law, but a fact from which a legal conclusion is to be drawn."

Goode, J., in Barton v. Barton, 119 Mo. App. l. c. 528, summarizes the holding of the Nichols Case thus: "The gravamen of the cause of action in a case like

this one is maliciously inducing one spouse to sepa-
rate from and abandon the other."

"To entice away or corrupt the mind of one's
consort is a civil wrong for which the offender is lia-
ble to the injured wife." [Mr. Justice BROWN in Read-
ing v. Gazzam, 200 Pa. St. 1. c. 106.]

Keeping in mind the real issue, as above outlined,
the vice of allowing this case to break on technicalities
peculiar to slander is apparent.

(b). But allowing the conversation might be
privileged, under the rule in slander and libel, yet it
was only a qualified privilege. Now, no man has a
qualified privilege to lie or maliciously defame another.
The right doctrine and the reason of it are well put by
Baron PARKE in Toogood v. Spyring, 4 Tyrw. 582,
thus: "Communications *fairly warranted by reason-
able exigencies and honestly made* are protected for
the common convenience and welfare of society, and
the law has not restricted the right to make them with-
in any narrow limits." Under that pronouncement,
privilege flies out of the window when malice comes
in at the door. Qualified privilege "proceeds upon the
assumption that the communication was honestly made,
in the belief that it was true, and with no motive of
malice." [AMES, J., in Atwill v. Mackintosh, 120 Mass.
1. c. 183.]

There is a precept of the law to the effect that
slanderous words are prima facie untrue. A presump-
tion lies that way. Therefore when the occasion is
semi-privileged—i. e., qualifiedly privileged— that pre-
sumption is suspended. Its suspension, however,
leaves the matter open to proof of express malice and
plaintiff merely carries the burden of proving the accu-
sation was not made in good faith but was false and
made maliciously. [Yager v. Bruce, 116 Mo. App. 1.
c. 483, *et seq.*] Malice proved destroys privilege
moved. A privilege abused is a privilege unused.
That result accords with natural justice, and natural

justice is the everlasting spring whence good law flows. In Meriwether v. Knapp & Co., 224 Mo. 617, privilege was pleaded. The case had been here before (211 Mo. 199), and we had sent it down to have the issue of malice in a certain omission submitted to the jury. When the case came up again the judgment was affirmed on the theory that the existence of malice found by way of proper instructions cut away the privilege. See, Finley v. Steele, 159 Mo. l. c. 304, *et seq*; Wagner v. Scott, 164 Mo. l. c. 297 *et seq.*; Brown v. Globe Printing Co., 213 Mo. l. c. 649 *et seq.*; Buisson v. Huard, 106 La. l. c. 777 *et seq.*; Briggs v. Garrett, 111 Pa. St. l. c. 414.

"We are met here with the inquiry, is falsehood privileged?" says PAXSON, J., in the Briggs Case. "I answer no. A lie is never privileged. It always has malice coiled up within it. When a man coins and utters a lie, or when he repeats it knowing it to be false, the law implies malice, and he cannot shelter himself behind the doctrine of privileged communications. . . . It is mistakes, not lies, that are protected under the doctrine of privilege."

(c). There is a further sensible doctrine invoked by learned counsel for plaintiff, viz., where the reports originate with defendant and what he has theretofore said produced the inquiries, the communication is not privileged—*contra,* where the reports originate elsewhere and defendant called on to report has *bona fide* made the statement. That doctrine is vouched for by no less an authority than Lord LYNDHURST in Smith v. Mathews, 1 M. & Rob. 151. To the same effect is Belair v. Chausse, 15 *Rap. Jud. Off. de Quebec* (*Cour Superieure*), p. 512. To the same effect is Pattison v. Jones, 8 Barn. & Cress. 578—a case in which Lord Tenterden sat. A like case is Nott v. Stoddard, 38 Vt. l. c. 31, *et seq.* Another is Griffiths v. Lewis, 53 Eng. Com. Law Rep. 60. Others are Thorn v. Moser, 1

Denio, 488; and Wharton v. Chunn, 115 S. W. (Tex.) 887.

This defendant called on for a retraction repeats and vouches for slanders of which he was the sole author and adds other accusations presumably found false by the jury.

The trial court did not deal amiss with the testimony—anent privilege.

III. *Of the instructions.*

(a). The first instruction for plaintiff reads: "The court instructs the jury that should they believe and find from the evidence that the defendant wrongfully and maliciously, induced and influenced plaintiff's husband to leave and abandon her, and to live separate and apart from her, and that plaintiff's said husband, being so wrongfully and maliciously induced and influenced by the defendant, did, by reason thereof, on or about the 31st day of October, 1905, leave and abandon plaintiff, and has since said date lived separate and apart from the plaintiff, by reason of the said wrongful and malicious inducement and influence of the defendant, then, your verdict will be for the plaintiff."

That instruction is criticised as a "roving commission" in that it was not confined to the issues—noticeably in omitting all reference to the matter of "slander." But the issue in this case was not slander, *qua* slander. The issue, as pointed out in Paragraph II, was the separation of one spouse from the other by malicious inducements and influences. The *evidence,* the proof, leading up to that result, viz., slander, had no place in the constitutive facts and ultimate issue to go to the jury. It was so ruled pointedly in the Nichols Case, 134 Mo. 187, supra, and when that case reached this court on second appeal (147 Mo. 387) an instruction less comprehensive than the

one under review was held a proper declaration of
law.

On the authority of that case and cases following
it, the point is disallowed to defendant.

(b). There was such profusion of instructions
on defendant's side as would unduly swell this opin-
ion to reproduce them. In a group of defendant's the
court interlined such phrases as these: "and had rea-
sonable grounds for believing," "that defendant did
not have reasonable grounds to believe the same,"
"had good reason to believe," "had good grounds
for such belief," and counsel argue such interpolations
were erroneous. To make the matter understandable,
it may be well to give a few examples and copy a little
of the context, marking the interpolation in brackets.
In one instruction, the court was dealing with the
right of defendant to respond to his son's request re-
lating to a difficulty between defendant and Marker.
*Inter alia,* the jury were told this: " . . . if the
jury believe that in making any such statement or
statements at the request of either plaintiff or de-
fendant's son . . . he acted in good faith and
simply told what he (had good reason to believe and
did) believe was true . . . it is immaterial in this
case whether his statement to said Emmett Cornelius
is true or not," etc. In another, directed to the same
and kindred matter, the jury, *inter alia,* were told:
" . . . if the jury believe such statements were
made by defendant under the belief that they were
correct statements (and defendant had good grounds
for such belief) then said statements, whether they
were true and correct or not, constitute no cause of
action," etc. In another, the jury were told if they
believe that defendant did not advise Emmett Cornel-
ius to live no longer with his wife and what he may
have said was simply an expression on his part at the
request of his son of plaintiff as to what he actually

believed (and had reasonable grounds for believing), plaintiff could not recover. There are others of like purport, but the foregoing sufficiently illustrate the use made of them. The question is: Were they proper?

The inquiry is leveled at fundamentals. Assuming a person is *sui juris*, can he in *good faith* believe what he has no *reasonable grounds* for believing? In good morals, can a man (he of the *genus homo sapiens*) justify himself in doing or saying a thing without some good reason or ground for his act or word? Can he in the light of this day rely on dreams, witchcraft, or an unreasoned vagary or groundless suspicion hatched by a bad motive and seen through a jaundiced eye? are not reasonable grounds for belief an essential element in good faith and honest purpose? There can be no two ways of looking at such a fireside proposition. That good reason is an element in justification at law lies at the root and nature of things. "Come, let us reason together" is the Alpha and Omega of the legal alphabet. The law *is* reason, and the proposition that a defense can be interposed to liability not bottomed on reason is literally nonsense.

The instructions, modified as indicated, related not only to the question of privilege discussed in a former paragraph, but to the related question of the inherent right of the parent to advise his child. Justice PAXSON in the Briggs Case, supra, said: "A communication to be privileged must be made upon a proper occasion, from a proper motive, *and must be based upon reasonable or probable cause.*" In Atwill v. Mackintosh, supra, AMES, J., speaking to the point, said: "The jury may draw the inference of malice, not only from extrinsic facts, as, for instance, from proof that the defendant *knew* the charges to be false, *or had no reason to believe them to be true,* but also from the terms in which the communication is made." In speaking to the right of the parent to advise his

married child in Oakman v. Belden, 94 Me. 1. c. 282; SAVAGE, J., said: "Whether the motive was proper or improper is always to be considered. Whether the persuasion of the argument is proper and reasonable, under the conditions presented to the parent's mind, is also always to be considered. It may turn out that the parent acted upon mistaken premises, or upon false information, or his advice and his interference may have been unfortunate; still, we repeat, if he acts in good faith, for the daughter's good, *upon reasonable grounds of belief,* he is not liable to the husband." In other words, the test of inquiry and rule of decision is the *quo animus,* and to determine the *quo animus,* you examine "the reasonable grounds of belief" (Hutcheson v. Peck, 5 John. 196—per KENT, C. J.). In the Oakman Case many authorities are reviewed, holding that the parent's belief must be honest, justified by information received by him, he must have *warrant* for the belief and act from pure motives, he must use "fair arguments" in order that his proper intent may appear. He may have acted on mistaken premises or false information in giving his advice so long as he fairly and honestly believes and used reasonable arguments in the premises. [Multer v. Knibbs, 193 Mass. 1. c. 558, *et seq.*] In Ashcroft v. Hammond, 132 App. Div. N. Y. Sup. Ct. 1. c. 6, GAYNOR, J., said (in a libel suit and speaking to the point of privilege): "Therefore if the defense of such qualified privilege be pleaded, and the occasion of qualified privilege be shown . . . the burden is put upon the plaintiff of destroying the privilege. . . . This he may do by showing that the published matter was false and the publication malicious. Having proved the matter false, *he proves malice by showing that the defendant knew it was false, or did not have probable cause to believe it to be true.*" Such pronouncements might be extended *ad infinitum.*

In conclusion, we refer to the doctrine of the crim-

inal law in dealing with probable cause and the right to act on appearances where self-defense is interposed. The rule is that defendant must have reasonable cause to apprehend danger. The appearances may be false and defendant can act on them, but his own belief in them is not sufficient unless he had reasonable cause for it. The circumstances must warrant the belief and the jury are the final judges of the reasonableness of his apprehension. [State v. Parker, 106 Mo. l. c. 224, *et seq.*]

There was no error in modifying the instructions in the particulars in hand.

(c). Defendant asked instruction 18. The court modified it, first, by certain proper interlineations; second, by striking out the clause in brackets, shown in the following excerpt: " . . . and you are further instructed that (the law presumes that counsel and advice given by a father to his son is given in good faith and from proper motives and honest impulses, and that the burden is upon plaintiff to establish to your satisfaction by a preponderance of all the testimony that said counsel and advice was not given in good faith but through malice, and unless she has established such facts to your reasonable satisfaction you will find for defendant"). The court wrote in lieu of the matter in brackets, the following: "It devolves upon the plaintiff to establish to your satisfaction that the defendant was actuated by malice in what he did or said in the premises," and gave the instruction. Observe, the material variation is the omission of any presumption running in favor of the father's good faith, proper motives and honest impulses in giving advice to his son. And the question is: Is that omission reversible error? We think defendant entitled to the presumption.

A parent is not a stranger to his married child. Advice from him in so close and delicate a matter as his son's domestic welfare and honor stands on quite

a different foot than advice from a stranger. Paren-
tal solicitude and instinct accord with the course and
laws of nature, and his advice has the initial benedic-
tion of presumptively springing from commendable
motives. The presumption is a rebuttable one, but
"the plaintiff should be held to strict rules" (Barton v.
Barton, 119 Mo. App. l. c. 530), and while its existence
may be overthrown by proof of malice, yet that seems
no good reason for not giving it. In Hutcheson v.
Peck, 5 Johns. 196, speaking of a parent, KENT, C. J.,
said: "Bad or unworthy motives cannot be pre-
sumed." He quotes approvingly Lord Coke's *dictum*:
"It is nature's profession to assist, maintain and con-
sole the child." In Pollock v. Pollock, 29 N. Y. Sup.
l. c. 39, is this from BISCHOFF, J.: "The motives of a
parent, in harboring, sheltering and otherwise extend-
ing aid and assistance to a child are presumed to be
good until the contrary is shown." In Tucker v. Tuck-
er, 74 Miss. 93, it was said: "The instincts and the
conscience unite to impose upon the parent the duty
of watching over, caring for, counseling and advising
the child at every period of life, before marriage and
after marriage, whenever the necessities of the child's
situation require or justify such action on the parent's
part. The reciprocal obligations of parent and child
last through life." In Brown v. Brown, 124 N. C. 19,
it was said: "The presumption in fact and in law in
all such cases must be and is that the parent will act
only for the best interest of the child and for the honor
of the family." In Reed v. Reed, 33 N. E. 638, it is
said: "All legitimate presumptions, in such cases,
must be that the parent will act only for the best in-
terests of the child. . . . In such a case the motives
of the parent are presumed good until the contrary is
made to appear,"—citing, Burnett v. Burkhead, 21
Ark. 79. In Trumbull v. Trumbull, 71 Neb. 186, it was
ruled that "the presumption is that the advice was
given in good faith."

It is argued for plaintiff that malice overcomes the presumption, and as the court instructed fully on malice that is sufficient, as from those instructions the jury could see the presumption existed. Therefore, no harm came to defendant. But such character of argument pressed home would overturn the necessity of giving the rule of law in criminal cases of a presumption of innocence. If A is entitled to be clothed (say, with a presumption) on a journey, and if he may possibly run the chance to lose his clothes by the vicissitudes and hazards of his trip, does it matter not to him if he *start* with no clothes at all? May he not keep them as long as he can? Furthermore, if defendant was entitled to the presumption of good faith, as he was, its existence should not have been left to be *felt out* and inferred by way of implication and argument by the jury, but it should have been boldly and plainly declared. Says Mr. Justice Story in Livingston v. Md. Ins. Co., 7 Cranch, l. c. 544, "And if, in point of law, the plaintiffs were entitled to such direction, the court erred in their refusal, although the direction, afterwards given by the court might, by inference and argument, in the opinion of this court be pressed to the same extent. For the party has a right to a direct and positive instruction; and the jury are not to be left to believe in distinctions where none exist, or to reconcile propositions by mere argument and inference. It would be a dangerous practice and tend to mislead instead of enlightening a jury."

As defendant was not allowed the benefit of the presumption of good faith in any other instruction, he was cut off from a clear legal right. This defendant certainly needed every help the law allows. For this cause the judgment must be reversed and the cause remanded.

(d). Defendant further complains that certain instructions were refused outright. We pass the matter with the observation that we have examined them

and conclude they were properly refused. If any of them announce correct propositions, they were contained in given instructions. And while we are about it we may as well say that defendant's side was overloaded with instructions containing repetitions in one form or another of the same or similar propositions. This should be avoided on another trial. By reiterating propositions the court gives undue prominence to them and a corresponding slight to those not reiterated for plaintiff. The scales of the law should be held even. The disposition made of the case makes it useless to consider the amount of the verdict.

For the error pointed out, the judgment is reversed and the cause is remanded for a new trial. *Woodson, P. J.,* concurs in result in separate opinion. *Graves, J.,* concurs in result.

## SEPARATE CONCURRING OPINION.

WOODSON, J.—I concur in what my learned associate says regarding the presumption as to the good faith of the parent in advising his or her child, excepting the following sentence: "This defendant certainly needed every help the law allows." I dissent from those words, for the reason that they imply that the defendant has no merit, in point of fact, in his defense, and for that reason he ought to have, at least, some little legal defense. Upon the next trial counsel will so argue, and the jury will so consider that language.

I also dissent from all the remaining portions of the opinion, except the conclusion reached, not because it does not state many sound legal propositions, but for the reason that they are not applicable to the facts of this case. They are purely abstract legal propositions.

It seems to me that my learned associate has misconceived this case.

The opinion states and proceeds throughout upon the theory that defendant was lying from the inception of this unfortunate trouble to the termination of the trial.

Now, in point of fact, if I have read correctly the majority opinion, as well as the record in the case, then I have no hesitancy whatever in stating that there is no evidence stated in either which smacks of willful lying on the part of the defendant. The record shows, and the opinion concedes, that every fact stated by defendant upon which he based his opinion of plaintiff, and upon which he predicated his advice to her husband, his son, and only child, if any he gave, was absolutely and literally true. For instance, it is not denied, but what "the pebble incident," "the curtain-stretching incident," "the-going-to-the-barn incident," "the having-something-in-her-apron-which-she-would-not-show-him incident," "the broomstick incident," and "the-ordering-of-Marker-out-of-the-house incident," all mentioned in the opinion, actually occurred.

The most that can be said of them, in the light of plaintiff's evidence, is, the defendant innocently attached too great importance to them, and thereby unjustly accused her of improper conduct. Not only that, but the entire record is totally barren of all evidence which tends in the remotest degree to show any motive whatever defendant had for falsely accusing plaintiff, or for desiring the separation of his son from her, save and except those "incidents" themselves.

If defendant honestly believed those undisputed facts pointed to, and induced him to actually believe, plaintiff guilty of misconduct, then, in my judgment, his communication of them to his son was privileged, and constitutes a perfect bar to plaintiff's right of action, however unreasonable he may have been in attaching such importance to them.

But in so telling the jury, the court should be careful to instruct them, that if they believed from the

evidence that the defendant did not honestly believe in her guilt, but that he seized upon said incidents for the purpose of wreaking his malice, spite and ill-will against her, then his opinion based upon those matters would not bar her right to a recovery. In other words, because of the peculiar protection the law throws around the advice of a parent to a child, in order to prevent its abuse, the good faith of the parent should be submitted to the jury in both the affirmative and negative forms. I understand that in the case of parents, the law only requires them to honestly, that is, in good faith, advise their children, and it does not require them to have what is ordinarily termed reasonable grounds therefor. But in the case of strangers, the adviser must go one step further and show not only good faith on his part, but that he had reasonable grounds also for so advising. This difference runs through all the cases, and I think wisely so; and I know of no authority holding to the contrary.

Wherever there is a doubt, the law resolves it in favor of the good faith of the parent, and justly so; but that is not true as to strangers—they must proceed upon reasonable grounds. So says the law, and so says human nature; and parents will continue to so advise their children because of their deep-seated interest in them and for their welfare, which often, as we all know from personal experience, causes them to act upon appearances, and not waiting for the slow process of investigation of their dangerous or perilous position. As previously stated, the law requires such investigation on the part of strangers, and for that reason their advice must be based upon reasonable grounds; but not so with a parent—he or she acts upon the impulse, prompted by love, affection, duty and anxiety toward their offspring, their own flesh and blood.

This decision may result in holding defendant, and perchance others, pecuniarily liable for giving ex-

pression to their deep-seated, God-given sentiments and convictions, but, nevertheless, we all know they will go on unheeding its wise injunction, and voice their parental instincts and devotion to their children, and continue to advise them from honest appearances, and will not procrastinate by a slow process of investigation.

Human laws are made for men, and not man for human laws; and whenever they do violence to his nature, they are unwise and become dead letters. I therefore concur in reversing the judgment and remanding the cause.