# Wytheville.

## Rose Harlow, et al. v. Gladys E. C. Harlow.

June 14, 1928.

The opinion states the case.

*John S. Barbour*, for the plaintiffs in error.

*Daniel Threw Wright, Raymond B. Dickey* and *Carl Budwesky*, for the defendant in error.

CHICHESTER, J., delivered the opinion of the court.

The plaintiffs in error, Rose Harlow, Lillian Harlow Green, George A. Harlow and Mary D. Harlow (who with Lena Hartigan and Edwin Harlow) were defendants in the trial court and are hereinafter called defendants, are here complaining of a judgment of the Corporation Court of Alexandria against them in favor of Gladys E. Cowles Harlow, plaintiff in the trial court, and hereinafter called plaintiff, in the sum of $13,500.00 for alleged alienation of plaintiff's husband's affections.

The jury found a verdict against all the defendants in the sum of $20,000.00, but the court set the verdict of the jury aside as to the defendants, Lena Hartigan and Edwin Harlow, upon motion of defendants' counsel, upon the ground that there was no evidence to support it, and reduced the damages proportionately, that is to $13,500.00.

The plaintiff assigns as cross-error this action of the trial court and contends that judgment should have been entered on the verdict for $20,000.00 against all the defendants.

The defendants assign numerous errors. They involve the refusal of the court to set the verdict aside as to each of the defendants upon the ground that the verdict is without evidence to support it, and its refusal to enter judgment for them; its refusal to set aside the verdict on the ground that it is excessive and tainted with passion and prejudice; that the remitter was insufficient; for alleged errors in instructions and in the admission and exclusion of evidence.

In our view of the case it is not necessary to consider at length any of the assignments of error on the part of the defendants, except that which charges that the court erred in not setting aside the verdict, (1) on the

ground that there was no evidence to support it; (2) because it was excessive and tainted with passion and prejudice, and (3) because the remitter required by the court in the amount of the verdict was insufficient.

It will be necessary also to consider the cross-error assigned by the plaintiff.

(1) There was only one issue of fact presented to the jury by the evidence in this case, as we think will be clearly demonstrated presently, and upon that issue there was a direct conflict in the evidence. The verdict of the jury determined this issue in favor of the plaintiff. The issue presented a question of veracity between the plaintiff on one side and the defendants on the other. The plaintiff charged in her declaration that the defendants conspired together to alienate her husband's affections from her and that they succeeded in doing so, and that he, due to their influence and persuasion, renounced her in the presence of a number of the defendants while he was lying on his death bed. The defendants, with one accord, deny that they ever even talked to the husband about his marital relations with plaintiff or that they ever advised or attempted to influence him to renounce her and sever those relations. That he did do it all parties admit.

It follows that upon the question now being considered it is only necessary to review the evidence introduced by the plaintiff to determine whether it supports the verdict found by the jury.

The evidence introduced on behalf of the plaintiff shows that John M. Harlow, referred to frequently in the record as "Dick" Harlow, deceased husband of Gladys E. C. Harlow, the plaintiff, was twice married. He was divorced by his first wife whom he married in 1901. He had one child, a daughter, now Mrs. McGinnis, by this marriage. In 1921 he married the

defendant in error, a New York girl who came to Washington to work during the war. There is ample proof in the record that John M. Harlow and his second wife were very much devoted to each other both before and after their marriage and up to the time, during his last illness, when he went or was carried to Alexandria to the home of his mother, Rose Harlow. He had been a shiftless and somewhat wild person up to the time of his second marriage. After that he was saving and industrious, evidently under the influence of his wife who appears to have been a most excellent and estimable woman and wife. At the time of his last illness, his wife, who continued to work for the Government after her marriage, as she had been doing before, had deposited from her own earnings in a savings bank, to the credit of her husband, $936.00, and her husband had a checking account for current expenses in another bank of between $400.00 and $500.00.

After his marriage he and his wife, the plaintiff, lived in an apartment in Washington. He became ill in the spring of 1923 and grew steadily worse until he died.

His people were Roman Catholics and he was, or had been, a member of the church also. His first wife was a Roman Catholic but his second wife, the plaintiff, was a Protestant. This, however, seemed to make no difference in the happiness of the couple, until the husband went or was taken to Alexandria on August 4, 1923, after he became ill, where he went to spend the day but where he remained until his death on September 17, 1923. His wife acquiesced in his remaining in Alexandria, where he could have the attention his mother, sisters and brothers would give him, during her absence at her office during the day, but at first she visited him every day. Prior to the

time when members of his family were notified of his illness, they either did not know or pretended not to know of his second marriage, and they apparently never recognized their brother and the plaintiff as husband and wife. Before the brother had ever come to Alexandria even for a visit of a day at a time, one or more of them told the plaintiff that he had lost his soul and that she, plaintiff, would have to help him get it back.

His mother, Rose Harlow, two brothers, George Harlow and Edwin Harlow, and two sisters, Mrs. Lillian Harlow Green and Mary D. Harlow, lived together, in the same house, in Alexandria. Mrs. Hartigan, the other defendant, lived in Washington. When John M. Harlow was taken to the Alexandria home in an almost dying condition on August 4, there is no doubt about the fact that the defendant in error was a most devoted wife and that he was a most devoted husband. That his whole attitude toward his wife was changed during the six weeks he lived in the home of his mother and sisters and brothers; that he became alienated in his affection for her, and finally renounced her, is beyond question. That this change was wilfully brought about by the united efforts of at least the mother, Mrs. Green, Miss Mary Harlow and George Harlow the jury had a right to conclude from the testimony of the plaintiff, which the record shows was corroborated on every material point. By this testimony and all fair inferences therefrom this court is bound, as was the trial court, upon the motion to set aside the verdict. It would not be profitable, and it is not necessary, to undertake an extended review of the evidence supporting the charge made by the plaintiff in her declaration.

It is probably true that the conduct of the defendants

was not animated in the beginning by any personal animosity toward the plaintiff. Their zeal may have been the result of religious fanaticism running wild. They believed that a marriage once entered into could not be dissolved by divorce, and that the marriage of a divorced person was unlawful, immoral and adulterous, although the law of the land was to the contrary. They all admitted this. There had for many years been substantially no contact between them and the plaintiff's husband. He was living in Washington, active in the affairs of the world, and out of touch and sympathy with the narrow views of his family. Their lives were in channels so far apart that none of the defendants, if they are to be believed, even knew he was married until a long time afterwards, when he telephoned them that he was ill, and they came, seeing with their own eyes that he was living with a woman. One of the plaintiffs in error, Mrs. Green, came to the apartment, met his wife, and then for the first time knew definitely that he was married. Immediately on that first visit, she said to the plaintiff, "Gladys, you have got to help get his soul back. He has lost it and you've got to let him go back to the Church."

From this time on, the united idea of at least four of the defendants seems to have been to get his wife out of his life because, as they viewed it, there had been no lawful marriage. When she did not yield to their wishes and suggestions and eliminate herself, they proceeded to bend every effort to eliminate her, and from this time their malicious and vindictive spirit toward her is evident in every word and deed.

After her husband went to Alexandria on August 4th the plaintiff, at first, went over there from Washington to see him every day, but it became apparent at an early date that she was not wanted so often, and

her time was limited frequently, by demand of members of the family, to a visit of ten minutes. Plaintiff testified that they (referring to Mrs. Harlow, the mother, Mrs. Green, Miss Mary Harlow and the brother, George Harlow) would meet her at the door and when they saw who had called would say: "Well, you *might* see him. We will see if he is up or sitting up, and they would treat me very coolly and indifferent, slam the doors and rush past me and not address me."

It was proved in the evidence that a Roman Catholic priest visited the husband nearly every day. In spite of all this the husband does not seem to have weakened materially in his affections for his wife until after the latter part of August when he had greatly weakened physically, because just prior to that time he requested his wife to come over and get him and take him back home; but it became more apparent every day that the plaintiff's visits were unwelcome to members of the household, and she was told that she should not come so often; that people were talking about her; that she was not "Dick's" legal wife, and that she had lived with him in adultery for two years.

Finally, contrary to the usual custom, the plaintiff was invited over to Alexandria to see her husband on the 1st of September. She states that Mrs. Hartigan, the sister living in Washington, 'phoned her reminding her that she had been told to come to Alexandria on the 1st of September. She was not suspicious of this unusual invitation until she reached Alexandria where she found Mrs. Harlow, the mother, the sisters and George Harlow. She was admitted by Miss Mary Harlow. What occurred thereafter is best told in her own language.

"Q. Did she say anything?

"A. Admitted me. No, nothing in particular.

"Q. Did she greet you at all?

"A. She just merely opened the door. I went along upstairs to where my husband was. When I entered his room, Mrs. Green and he were there. He said: 'Well, pet, it is all over. I have renounced you.' Mrs. Green said: 'Yes, you will never see him again. He will never live with you again. This is the last time you will ever see him.'

"Q. Was anyone there besides her and you?

"A. Miss Mary Harlow.

"Q. Did she hear?

"A. She also said: '*Yes, you will never see him again.*'

"Q. Did she say that, too?

"A. *Absolutely.*

"Q. Were any of the others there?

"A. I don't remember any others right in the room at that time.

"Q. What did you say in their presence, if anything?

"A. I said: 'Why, I am his legal wife.'

"Q. Proceed.

"A. I said: 'He can't renounce me. He can't give me up. If he wants to go back to the church, that is all right. I never interfered with anything that he does. He can go to church but I am his legal wife.'

"Q. What was said to that and by whom?

"A. They said: 'Oh, you are not. *We* don't recognize you. *You have been living in adultery for two years.*'

"Q. Well, now who said that?

"A. Miss Harlow and Mrs. Green both voiced it.

"Q. Anything else said?

"A. They told me I could stay just a few minutes.

"Q. How long did you stay on that occasion?

"A. Probably ten or fifteen minutes.

"Q. Well, did you ever see him again?

"A. Once.

\* \* \* \* \* \* \* \* \*

"Q. Did you make effort to get in touch with his physician after you were told that you couldn't come back again?

"A. Oh, yes. After they had told me that I would never see him again after the first of September. Next day I believe it was, I 'phoned doctor Jones and asked him. I 'phoned him every day up to his death. He didn't always answer. I told doctor Jones on the first call that I made. I said: 'Doctor Jones, now I want you to inform me how my husband is. You know I can't get in touch with him any other way. I will rely on you to tell me every night when I call you.' And he promised he would.

"Q. And, did you miss a single day calling the doctor?

"A. I did not. If he was not in in the evening, I would call him again until I got in touch with him.

"Q. You told us that you did see your husband on one more occasion. When was it?

"A. On the seventh of September.

"Q. Under what circumstances?

"A. I went over with some friends.

"Q. Who?

"A. Mr. and Mrs. Nichols.

"Q. Who else. Tell all about it.

"A. I took a physician; a nurse; Mr. Clybourne.

"Q. Proceed. Was that the occasion when Mr. Dickey was along?

"A. Yes.

\* \* \* \* \* \* \* \* \*

"Q. Well, tell now what happened.

"A. I asked these people to go over with me that day to help me. I knew my husband was anxious to

leave there and to have medical attention, to go to some good hospital where he would receive every care.

"Q. How long after the time that he had told you and Mrs. Nichols was it that you went over with these friends of yours?

"A. Well, I think that we saw—Mrs. Nichols and I saw him about the middle of August. Probably the tenth or eleventh. And I—he had told me after that, up to the first of September, the last time that I had talked with him, that he wanted me to bring help to him, and I was trying to think of a way to take help to him and to get the right doctor. I had mentioned on one occasion to Mrs. Green that I wasn't satisfied with the medical attention he was having.

\*   ·   \*    \*    \*    \*    \*    \*    \*    \*

"Q. Well, where were you when doctor Rutherford went in?

"A. I was outside in the machine.

"Q. Did you see him go in?

"A. Yes.

"Q. How soon afterwards did you go in?

"A. I went in shortly after.

"Q. What happened after you got in that you saw yourself and heard?

"A. I went in with Mrs. Nichols and Mr. Clybourne and as I entered the hall, George Harlow was coming down the stairs and I said: 'I want to see Dick. I have come over to see if he can get medical attention and see about taking him to a hospital.' He grabbed me by both arms and said: 'You will never see him. You can't see him. You are not his wife.'

"Q. What was his manner of seizing you?

"A. He grabbed me by both arms.

"Q. Was it violent or gentle?

"A. Very violently.

"Q. Did it disturb your equilibrium at all? Your balance?

"A. Well, Mrs. Nichols was right directly back of me. He gave me such a push that I fell against her.

"Q. Was his grasp painful or not?

"A. Well, I know that the red marks lasted for some time.

"Q. What sort of marks. Do you mean black and blue marks on your arm?

"A. No; just red marks from pressure.

"Q. How long were they apparent on your arms?

"A. About a day.

"Q. Did you actually observe them when you got home that night?

"A. Yes.

"Q. What happened after that? Did he say anything more?

"A. He said I couldn't see him. He kept repeating that over and over again: 'You will never see him. You can't see him. You are not his wife.'

"Q. Proceed. Hurry on. Tell the story.

"A. So he was trying to back up the stairs to get up to the room and I told him, kept telling him, 'I want to see him because I am his lawful wife. You can't keep me from seeing him.' And he kept repeating: 'You can't see him. You can't see him.' And about that time he ran back up the stairs and locked both doors to the room in which my husband lay.

"Q. Where were the other members of the family at that time, if you remember?

"A. I remember seeing his mother down on the first floor. She came along the little hallway that led through the dining room and she said: 'This is such an outrage. Get her out of here. She is back here again. She isn't his wife.' And also at the top of

the stairs, when I went up the stairs after George Harlow had released me, Mrs. Green was at the top of the stairs right here at the little landing. She grabbed me by the arms and tried to pull me in the room in the rear.

"Q. Did she say anything?

"A. She said: 'You can't go in there. You can't see him. You have been living in adultery. You are not his wife.'

"Q. Proceed. What happened after that?

"A. Mrs. Nichols took hold of me and released me and she kept calling for the chief of police. So George Harlow, after he had locked my husband in the room, I think he was the one that went across the street to notify the chief of police. He came over shortly after that and they were all talking and saying that I could not see him; could not get in. The chief of police—

"Q. Well, were the doors of his room opened again?

"A. I tried to plead with them that I had brought this doctor to examine him and to talk with him and see what he could do for him. They finally consented to let him in by himself. They locked him in the room with my husband. Chief Goode came after that and I went downstairs and talked to him. My lawyer, or Mr. Dickey, came in with Chief Goode and talked to him about it. Chief Goode said that I should see him; that I was his lawful wife. Then George Harlow unlocked the door and let me in.

"Q. Who went in first? You or he?

"A. He did.

"Q. What happened after he went in?

"A. He kept repeating over and over again: 'Tell her to get out of here. Tell her you don't want her. Tell her you have renounced her. Tell her to get out.'

"Q. Who was he talking to?

"A. My husband.

"Q. And what happened?

"A. I said: 'Dick, we have come over to have doctor Rutherford talk to you and see what we can do for you; to take you to a hospital where you can get lots of care and attention.' George Harlow was repeating all the time: 'Tell her to get out. Tell her you don't want her. Tell her you want to stay here."

"Q. Proceed.

"A. So I asked him if he wanted to go with me to the hospital. He said: 'I want to stay right here.'

"Q. What else did he say, if you recall?

"A. He said: 'You know I have renounced you. I have gone back to the church and I am going to stay here.'

"Q. Was that the last of the conversation?

"A. Yes.

"Q. And did you go out and go home?

"A. Yes. After he said he was going to stay there, we turned and left the room and on home.

"Q. Did you ever see him again while he was alive?

"A. I never did.

"Q. When did he die?

"A. September 17, 1923.

"Q. Did the family send you any word of it?

"A. Absolutely no.

"Q. How did you hear it?

"A. I heard it through Mrs. Nichols. I was called at my office."

There is ample evidence here to support the charge of alienation of the husband's affections and there is ample evidence from the conduct of the defendants that they were animated by malice toward the plaintiff. If there is any other evidence necessary to estab-

lish the motives of the defendants and their hostility to the plaintiff and their intention to sever every tie between this husband and wife, it may be found in the fact that John Harlow had taken a policy of $5,000.00 prior to his marriage. Under the terms of this policy he had a right to change the beneficiary at will. His mother, Rose Harlow, was originally named as beneficiary, but after his marriage he changed the beneficiary to "Gladys Cowles Harlow, my wife." Five days after he was taken to the home of his family in Alexandria, the beneficiaries were changed to Rose Harlow, Lillian Harlow Green, Lillian Harlow McGinnis, Mrs. Gladys Cowles Harlow, George A. Harlow. About a month later than that, the beneficiaries were again changed, his wife, Gladys Cowles Harlow, being eliminated entirely, and the beneficiaries named as Rose Harlow, Lillian Harlow Green, Mary E. Harlow, Lillian Harlow McGinnis, George A. Harlow, Mrs. Richard H. Hartigan, Mary V. Harlow, Robert McGinnis, Rev. Louis Schmidt and Rev. Lawrence Kelley. The latter two being Roman Catholic priests.

After his marriage, the premiums on this policy were paid by the earnings of the plaintiff. Plaintiff's husband opened accounts at the different stores in Washington for her, never putting any limit on the amount of credit she might use. A year or two after their marriage, when they had finished paying for their furniture, a separate savings account was opened in which her earnings were deposited. When he was taken to Alexandria there were $936.00 in this account. On September 8th George Harlow wrote a letter to the manager of the hotel in which plaintiff's apartment was, and signed her husband's name to it, notifying him that Harlow would not be responsible for any debt

contracted in connection with his apartment; on the same day, he wrote in the Alexandria home, letters to every Washington house with which Harlow had given the plaintiff credit, notifying them not to give further credit to his wife. Four days after they got him to the Alexandria house, George Harlow drew to his own order a check on the savings account for $700.00.

So that, not only did the defendants utterly destroy the happy marital relations existing between this husband and wife at a time when the husband especially needed the care that only a wife can give, but they heaped grievous insult upon the wife because she would not yield to their wishes and absent herself from her husband, and in addition they absorbed by one means or another, in six weeks, over six thousand dollars which would have gone to the wife, the plaintiff, upon the death of her husband but for their interference. They either themselves parceled out among themselves, or induced this dying man to parcel among them (with the exception of Edwin Harlow), to the exclusion of the wife, a $5,000.00 life insurance policy in which she was named as sole beneficiary; they dissipated two bank accounts aggregating over $1,400.00, and in addition to this the mother received and appropriated to her own use $500.00 which the husband's employers paid over to her after her son's death, and to which, of course, the wife was legally entitled. The plaintiff's credit at the stores where she had had credit was cut off and the manager of the apartment where she lived was informed that the husband would not be responsible for rent. When her husband died his wife was not informed of his death, while his divorced wife was and was present just before or at his death. All of which shows that these defendants, because they did not recognize the second marriage of their son and

brother, had resolved to sever every vestige of the marital relation legally existing between him and his second wife, and to absorb and dissipate his property so that she could not get any benefit from it during the husband's lifetime or after his death.

These facts, which have not been and cannot be denied, throw a flood of light upon the motives which stirred these defendants into action, who set up their beliefs above the law of the land which they undertook to nullify, and they strongly tend to corroborate the charge of alienation.

██ Counsel insist that defendants had a right, if they entertained an honest belief that the husband's second marriage was morally wrong, sinful and contrary to the word of God or the tenets of their religion, and for that reason endangered his eternal welfare, to express that opinion to their brother. The first answer to this contention is that with one accord the defendants denied that they had ever advised their brother as to religion or that they had ever discussed or advised with him as to his marital relations with his second wife. They therefore made out no case which entitled them to defend against the charge on any such ground, and the court was too liberal in the granting of instructions when it included such a proposition in its instructions. The defendants are surely entitled to no stronger case than they have made out by their own evidence. They are certainly not entitled to any such defense or instruction upon the plaintiff's evidence. The review of the evidence of the plaintiff set out above clearly discloses this. There was no evidence in the case to justify any such instructions to the jury. It follows that, as stated in the beginning, the only issue of fact presented to the jury was the question as to whether the plaintiff or the defendants told the truth.

The defendants' evidence constituted a flat denial that they did anything that would cause any change of feeling on the part of the husband for his wife. The plaintiff's evidence discloses a malicious and wilful interference (from a legal standpoint) with the marital relations of a happy and affectionate couple lawfully married, intended to bring about an alienation, and further that it produced the separation between the spouses complained of.

The second answer to this contention is that this is not a case where any such principle as the defendants advance is applicable. It is not applicable in a case where the facts are as they appear in this case even under the guise that parents and brothers and sisters have superior privileges in the giving of advice of children and to brothers and sisters.

We do not doubt this principle when applied in a proper case. We are fully in accord with it, as we are in accord generally with the principles enunciated in the great array of authority to which we are referred by counsel for defendants upon the question of honest advice, but they have no application to the facts presented by this case. For this reason also the instructions involving honest advice were inappropriate to say the least. There was no occasion or reason for any advice in the instant case, and the giving of any even by parents or by brothers or sisters was an unwarranted interference.

The principles enunciated in *Nelson, et ux* v. *Nelson* (C. C. A.), 296 Federal, 369, are applicable to the situation here. In the opinion in that case the court said: "There is no evidence of misconduct or unworthiness on the part of this young wife. She bore a good reputation, was of good character, and was well received by the new neighbors and friends she acquired

in her new surroundings. Indeed the elder Mrs. Nelson testified that she was a girl of 'beautiful, lovable disposition,' and the elder Mr. Nelson said 'she was always truthful and loyal.' There is evidence of a neighbor who said she had a 'sunny, sweet disposition, was lovable, industrious, and a good housekeeper.'

"There is, therefore, the *absence of excuse for parental interference by advice or otherwise, as parents might give without malice* (italics ours). If the case is one of a young wife's laziness, unworthiness, meanness of habits, or improper conduct with other persons, or a secret marriage against the wishes of parents, or where a child married into an objectionable social status. The defense denied much of what the defendant in error said as to the acts of the plaintiffs in error, and their speech and purposes. They say, in effect, that Romeyn sent his wife away of his own initiative, and that they loved her all the time. * * *

"Their actions are inconsistent with their declared professions of affection for the defendant in error. Instead, a jury found that they were actuated by malice, and that they attempted to free their son from the obligations of wedlock. Keeping their son under their roof, and by a constant course of conduct and enticement, they destroyed the love of this young husband for his wife. * * *

"Direct evidence of a defendant's wrongful motive is not required, and the jury may be permitted to infer it from a defendant's words and actions proved by a plaintiff. * * *

"The court below said: 'Malice means a wrongful act done intentionally without just cause or excuse.' And it is assigned as error that 'this is misleading, and incorrect in an alienation case against parents,' and it is

asserted that 'the charge therefore ran in a circle.' This definition as given by the court finds support in the authorities. *Zimmerman* v. *Whiteley*, 134 Mich. 39, 95 N. W. 989; *Fronk* v. *Fronk*, 159 Mo. App. 543, 141 S. W. 692; Bagley, J., in *Bronage* v. *Proser*, 4 Barn. & C. 247. The criticism of this part of the charge presents no error. If there is evidence upon which the jury might have a right to find that the plaintiffs in error have actively interfered and caused their son to abandon his wife, and have deprived her of his affection and of the comfort and solace of his society, and have done this from motives of malice to the defendant in error, and not for purposes of affording proper protection to their child in furthering his true welfare, then the case must be left to the jury, with instructions that, if these facts be proved, the action is maintainable. *Kleist* v. *Breitung*, 232 Fed. 555, 556, Ann. Cas. 1916E, 1014; *Multer* v. *Knibbs*, 193 Mass. 556, 79 N. E. 762, 9 L. R. A. (N. S.) 322, 9 Ann. Cas. 958; *Bennett* v. *Smith*, 21 Barb. (N. Y.) 439.

"We regard the evidence of participation on the part of both plaintiffs in error as a jury question under the proofs. We must not be unmindful of the fact that human experience of this kind, resulting in a broken home, results from an accumulation of efforts, stealthily carried on. This disintegrating work may be resorted to with many subterfuges. A plaintiff may not produce the strongest kind of evidence to make out a case. A sulky mood, an insolent look, a gloomy manner, a constant derision and undermining of the affection of one for the other with malice, will accomplish the result, and will suffice in the necessity of legal proof. The fact that evidence is circumstantial does not impair its usefulness nor deprive it of potency. Direct evidence is, however, not indispensable. Circumstantial evi-

dence is competent to prove conspiracy from the very nature of the case, and the rule which admits this class of evidence applies generally in civil and criminal cases. * * * The jury has found that they conspired to separate the couple, and, therefore, each is a party to all acts done by the other before or after in furtherance of the common designs."

We have quoted at great length from the above case because it answers so clearly and so fully so many of the contentions of counsel for defendants in the instant case.

In *Ratcliffe* v. *Walker*, 117 Va. 569, 85 S. E. 575, Ann. Cas. 1917E, 1022, this court said: "But if there is evidence upon which the jury would have a right to find that the defendant has actively interfered to cause his daughter to abandon her husband, and has deprived him of her affections and of the comfort and solace of her society, and has done this from malice to the plaintiff, and not for the purpose of affording proper protection to his child and furthering her true welfare, then the case must be left to the jury, with the instruction that, if these facts are proved, the action may be maintained."

■ ■ *Woodhouse* v. *Woodhouse*, 99 Vt. 91, 130 Atl. 758, is such an illuminating case on the question of the right of parents to interfere in the marital affairs of their children, and what was said there is so appropriate here that we feel justified in quoting at length from it. In that case the court said: "While the law recognizes a superior right of interference on the part of parents, and will justify such interference for causes which would be no justification in favor of strangers, it is not to be understood that parents may influence their child to separate from a spouse with impunity. The relation of parent and child does not justify a

deliberate attempt without cause to bring about such a separation. To do so without justifiable cause is a tort, for which the parent, like any other person, is liable. This is the doctrine of practically all the cases, including many cited by the defendant. * * * It is sometimes said that in such an action the parent is liable only when he acts maliciously in bringing about the separation; and, again, that stronger evidence is required to maintain the action against parents than against strangers. But the distinction found in the cases is merely a matter of terminology. In principle they are in entire accord. The distinction between the liability of parents and that of strangers is only in what will justify their interference. Malice is generally, if not always, deemed an essential element of actions for alienation. This is so held where seduction or adultery is not involved. 13 R. C. L. 1466, section 515. *Geromini* v. *Brunelle*, 214 Mass. 492 [102 N. E. 67, 46 L. R. A. (N. S.) 465]. * * *

"Express malice need not be proved. Malice in the sense used in actions of this kind implies no more than the intentional doing of a wrongful act without just cause or excuse. Direct evidence of a parent's wrongful motive is not required, but malice may be inferred from conduct as in other cases where it is in issue. *Cornelius* v. *Cornelius*, 233 Mo. 1, 135 S. W. 65, 13 R. C. L. 1474; Note, Ann. Cas. 1912C, 1180; Note, Ann. Cas. 1917E, 1017. It may be inferred from wrongful and unjustifiable conduct which causes alienation. *Clark* v. *Clark*, 187 Ind. 25, 118 N. E. 123; *Westlake* v. *Westlake*, 34 Ohio St. 621 [32 Ann. Rep. 397].
* * * * * * * * *
"*Hope* v. *Twarling*, 111 Neb. 793, 198 N. W. 161; *McGuffie* v. *Hooper*, 122 Me. 118, 119 Atl. 111; *Level*

[Leavell] v. *Level* [Leavell], 122 Mo. App. 654, 99 S. W. 460; *Briles* v. *Briles*, 66 Ind. App. 444, 112 N. E. 449; *Jones* v. *Jones*, 96 Wash 172; 164 Pac. 757; *Cornelius* v. *Cornelius*, 233 Mo. 1, 135 S. W. 65; *Nelson* v. *Nelson*, (C. C. A.), 296, Fed. 369. In *Cornelius* v. *Cornelius*, it was argued, as here, that there was no proof of wrongful motive in what the defendant said or did, and none that what he said or did, caused the separation. The court had this to say: 'But learned counsel inadvertently argue unsoundly in that behalf; this, because the record abounds with signs of the defendant's antipathy for his son's wife. Wrongful motives, like good ones, are impalpable—a condition of the mind. They are not to be seen by the eye of the body, but by the mind's eye * * * They may be proved only by those visible acts or words shadowing forth their existence in the mind—words and acts standing as outward manifestations of inward feelings.'

"The comments of Manton, J., in *Nelson* v. *Nelson*, are pertinent: 'We must not be unmindful of the facts that human experience of this kind, resulting in a broken home, results from the accumulation of efforts stealthily carried on. This disintegrating work may be resorted to with many subterfuges. A plaintiff may not produce the strongest kind of evidence to make out a case. * * * The fact that evidence is circumstantial does not impair its usefulness nor deprive it of potency.

\*       \*       \*       \*       \*       \*       \*       \*       \*

"There was no evidence of misconduct or unworthiness on the part of the plaintiff. On the contrary, both defendants testified that they at no time had any cause for criticizing her. * * * It follows that there is a total absence of any excuse for parental interference by advice or otherwise, such as parents might give

without malice. Besides, the defendants do not claim, but rather deny, that they even advised a separation; so the principle on which most of the defendant's argument is based has no application. * * Defendants' actions ever after they learned of Douglas' engagement to the plaintiff, were so wholly inconsistent with their professions of regard at the trial, that the jury would be justified in discrediting their testimony. * * * Considering that the evidence showed the plaintiff and her husband were happy in each other's company when left to themselves, even to a time near their separation, it is a potent circumstance that no other probable cause than the influence of the defendants is disclosed for Douglas' progressive change of attitude toward the plaintiff ever after they learned of his proposed marriage. Their conduct thereafter toward the plaintiff was most unnatural on any theory advanced in defense, but on the contrary, was consistent with their expressions of dislike for her shown by the evidence. The circumstances would justify an inference of malice and a deliberate plan to bring about results finally accomplished. These facts, if found to exist, would so characterize the other evidence as to clearly make the question of liability one of fact for the jury."

No fuller or more effective answers could be made to the various contentions of counsel for defendants than are found in this case, and in *Woodhouse* v. *Woodhouse*, *supra*.

It appears to us therefore that the evidence of the plaintiff clearly establishes the conspiracy to alienate the affections of the husband from the wife, the plaintiff; that it clearly establishes the fact that his affections were alienated, and it is also clear from all the facts of the case that the conduct of the defendants

was the result of legal malice toward the plaintiff. The court might well have predicated an instruction on the testimony of the plaintiff and the witnesses who corroborated her, and instructed the jury that if they believed from the evidence that this testimony was true they should find for the plaintiff. If the jury believed the evidence introduced on behalf of the plaintiff, there could have been no other verdict than one for the plaintiff.

2. It is contended by counsel for defendants that the verdict was excessive and tainted with passion and prejudice, and

3. That the *remittitur* required by the court in the amount of the verdict was insufficient.

It is only necessary to recall as narrated above the evidence which supports this verdict, to justify the assertion that the plaintiff was entitled to a verdict not only for actual but for vindictive damages. If the evidence of the plaintiff is true it proved a deliberate and wanton assault not only on the individual marital rights of the plaintiff but upon the security and sanctity of the American home by despoiling it of the law's protection when the law of the land runs counter to religious belief. The jury also had a right to consider, in assessing punitive damages, that the plaintiff was deprived of the proceeds of the life insurance policy, which had belonged to her; of the funds in the savings bank and of various other funds heretofore mentioned, and it had a right to consider that an innocent and devoted wife was deprived of her husband and grossly insulted and humiliated on numerous occasions. Under such circumstances, the plaintiff was entitled to a substantial verdict.

3. The question of the sufficiency of the *remittitur*

will be disposed of under the cross-error assigned by plaintiff's counsel.

So far as the objections to instructions are concerned, from what has already been said, the instructions were more favorable to the defendants than they were entitled to, but in spite of them the jury found a verdict against defendants. But even if there had been any evidence to support the instructions upon the question of advice honestly given, we see no error in the instructions embodying this principle.

There was objection to certain evidence offered by the plaintiff, especially with reference to declarations by the plaintiff's husband. These declarations were properly admissible as they showed the state of mind of the husband toward his wife.

The evidence with reference to the change of beneficiaries in the life insurance policy of the husband was objected to, but as has been heretofore stated this evidence was permissible to show the attitude of the defendants toward the plaintiff, and it was also proof of the success of the defendant's efforts to alienate the husband's affections, if he himself changed the beneficiaries, which they say he did. It shows that what his prior love had provided for the welfare of his wife, a changed mind deprived her of.

There were several other objections to the action of the court in permitting the introduction of evidence or in refusing to admit evidence, but they are immaterial, involve no new questions, and have no bearing on the result. To discuss them would only unnecessarily prolong this opinion.

Exception was taken by the plaintiff to the action of the court in reducing the verdict from $20,000.00 to $13,500.00, and in setting aside the verdict as to Edwin Harlow and Mrs. Lena Harlow Harti-

gan. We agree with the court that there is insufficient evidence in the case to include Edwin Harlow as one of the conspirators or as having done any overt act to alienate the affections of his brother from the plaintiff. The plaintiff stated that upon one occasion when she took dinner with the Harlow family in Alexandria, Edwin Harlow was present and sat by her, paid no attention to her, did not address her, wait upon her or speak to her during the meal. He admitted that he heard his brother, the plaintiff's husband, say, after the first of September, that he had given up his wife. There was no other evidence involving him, and he was not the recipient of any part of the life insurance proceeds or any other funds absorbed by the other defendants.

We think the jury was justified in finding against the defendant, Mrs. Lena Harlow Hartigan. Although she lived in Washington she was in very close touch with all that was going on in the home at Alexandria, she told the plaintiff that she thought her husband should give her up and go back to the church, she visited the brother quite frequently in Washington before he went to Alexandria and was alone with him for a whole afternoon in his apartment there. She was very positive that the marriage of divorced persons was unlawful and not to be recognized and when the husband had reached the point where he decided to renounce his wife, Mrs. Hartigan 'phoned the plaintiff to come over to Alexandria on September 1st, reminding her that she was to go over there after six upon that day. It will also be recalled that immediately upon entering her husband's room in Alexandria on that occasion, without any preliminary remarks, he stated to her: "Pet, it is all over. I have renounced you and gone back to the church." The facts in connection with this

visit show clearly that the only object in getting the plaintiff to Alexandria on this occasion was to receive first hand the renunciation from her husband.

We think that this is sufficient to connect Mrs. Hartigan with the other defendants in bringing about the alienation of the affections of the husband.

The jury by their verdict found damages for the plaintiff in the sum of $20,000.00. So far as the *remittitur* is concerned, the court, in the exercise of its judicial discretion, reduced the amount of recovery from $20,000.00 to $13,500.00. We do not think, in view of all the circumstances of this case, that this was error. The greater part of the recovery must have been for punitive damages, and, as such, it constitutes a substantial recovery against defendants of moderate means.

Upon the whole case, we think the judgment of the trial court should be amended by including therein the defendant, Lena Harlow Hartigan, with the other defendants, Rose Harlow, George Harlow, Lillian Harlow Green and Mary D. Harlow, and as so amended that it be affirmed.

*Amended and affirmed.*